FILED
2014 Nov-12  AM 09:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **PAULA JANET MOAT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:4:13-CV-181-VEH** |
| | ) | |
| **AARON'S INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**MEMORANDUM OPINION**

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Paula Janet Moat ("Moat") initiated this action by filing a complaint on January 25, 2013, against defendant Aaron's, Inc. ("Aaron's) alleging a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 200e, *et seq*. ("Title VII"). (Doc. 1). Moat amended her complaint on July 23, 2013, to add a claim against Aaron's for retaliation in response to her complaints to the EEOC. (Doc. 15). The lawsuit stems from alleged sexual comments and gestures made by a male co-worker (an employee of the defendant) towards Moat, the management's failure to respond to Moat's complaints, and a variety of actions by the sales manager after Moat's complaints to the Equal

Employment Opportunity Commission ("EEOC"). (Doc. 1 at ¶¶9-10).

Moat filed her first charge of sex discrimination against Aaron's with the EEOC on or around June 25, 2012. (Doc. 7 ¶1). The EEOC issued a Dismissal and Notice of Rights on October 31, 2012, thereby giving Moat the right to sue. (*Id.*). On December 3, 2012, Moat filed a second charge with the EEOC against Aaron's alleging retaliation in response to her first charge. (*Id.* at ¶2). After Moat's complaint with this court was timely filed on January 25, 2013, the parties, on February 21, 2013, filed a joint motion to stay the proceedings until the EEOC decided the second charge. (Doc. 7). This court granted the requested stay. (Doc. 8). On June 4, 2013, the EEOC issued a dismissal notice of right to sue on the second charge. (Doc. 13 at 2). The stay was then lifted by the court on July 9, 2013. (Doc. 14).

Now pending before the court is Aaron's motion for summary judgment filed on April 14, 2014. (Doc. 32). The parties have briefed and filed evidence relating to the Motion (Docs. 31-32, 34, 38), and it is now under submission. For the reasons explained below, the Motion is due to be **GRANTED.**

## II.    STANDARDS

### A.    Summary Judgment

Summary judgment is proper only when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

**B.    Hostile Work Environment**

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). To establish a hostile work environment claim, an employee

must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as gender; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or of direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

### C.    Retaliation

"Retaliation against an employee who engages in statutorily protected activity is barred under both Title VII and § 1981." *Chapter 7 Trustee v. Gate Gourmet, Inc.* 683 F.3d 1249, 1257-58 (11th Cir. 2012). Further, in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court abrogated prior circuit law, including that of the Eleventh Circuit, limiting anti-retaliation claims under Title VII to claims involving actions that are related to employment or that occur at the workplace. *Id*. at 2409. Following *Burlington Northern*, the recognized elements of a claim of retaliation under Title VII are that the plaintiff: (1) engaged in statutorily protected activity; (2) suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.

The Eleventh Circuit has explained the standard for establishing the second

*prima facie* element to a Title VII retaliation claim:

> [T]he Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is ["]harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination."

*Wallace v. Georgia Dept. of Transp.*, 212 Fed. App'x 799, 802 (11th Cir. 2006) (quoting *Burlington Northern*, 548 U.S. at 57).

Once the *prima facie* case is made, the employer then has the burden of showing a legitimate, non-retaliatory reason for the adverse employment actions. *Wallace v. Georgia Dept. Of Transp.,* 212 Fed. App'x. 799, 800 (11th Cir. 2006). At that point, the plaintiff then has the burden of proving that the alleged reason for the action was only a pretext. *Id.*

## III.   STATEMENT OF FACTS

### A.   Material Undisputed Facts

#### 1.   Aaron's Sexual Harassment Policies

Aaron's maintains a Non-Discrimination and Sexual Harassment Policy (the "Policy") expressly stating that the Company "is firmly committed to prohibiting and preventing discrimination against any associate on the basis of race, color, sex, age religion, national origin, disability, veteran or other protected status" and that "all associates have the right to work in an environment free of sexual harassment." The

Policy also states,

> If you feel you have been discriminated against, sexually harassed, or denied advancement for which you are qualified, you need to call the Employee Relations Hotline in the Atlanta Home Office toll free at 866-453-5144 to report any such situation. Your concerns will be investigated promptly and appropriate remedial action will be taken if violations of our policy are discovered. Be assured that your call will be treated in the strictest confidence possible and you will incur no retaliation for reporting good faith claims.

(Doc. 31-1 at 84). Aaron's Non-Discrimination and Sexual Harassment Policy is published to employees in Aaron's Policy Manual and is also posted on the Company's intranet. Employees receive copies of this policy at the outset of their employment and sign acknowledgments that they understand Aaron's policies, including the Company's policies against harassment. In addition, when they clock-in and clock-out of Aaron's timekeeping system on a daily basis, employees must acknowledge a message stating that "To report discrimination/sexual harassment call 1-866-453-5144." Employees' pay stubs include the same message.

Managers of Aaron's stores have a duty to report sexual harassment if they see it or if someone complains to them about it. The manager is then required to report it to associate resources, the company's non-discrimination and sexual harassment hotline, or his immediate supervisor. If the manager failed to do so, depending on the situation and the severity, the associate resources department is supposed to make a report, put something in the manager's personnel file, and make the manager retake

the sexual harassment training.

### 2.    Moat's Employment at Aaron's

Aaron's hired Moat as a Customer Service Representative at its Gadsden store on October 10, 2011. In this role, she was responsible for making and processing in-store sales and for organizing customer files. Like all sales representatives at the store, she was also responsible for maintaining the appearance and upkeep of the store, including cleaning the store's showroom and restroom as needed. When she began her employment with Aaron's, she received a copy of Aaron's Policy Manual, including its Non-Discrimination and Sexual Harassment Policy, and signed a Policy Manual Acknowledgment form stating,

> I understand and acknowledge that I have a copy of the Company's Policy on Non-Discrimination, Sexual Harassment and Open Advancement. I understand that neither a member of management or any fellow associate is authorized to engage in any conduct that violates this policy and I agree to notify the Company by calling the toll-free number (800-335-2038) if I witness or believe I have been subjected to sexual harassment or any other form of discrimination.[1]

Moat also completed computer-based training programs regarding Aaron's Non-Discrimination and Sexual Harassment Policy during her employment with Aaron's.

---

[1] Moat's Response disputes another part of this paragraph of Aaron's statement of facts, saying "disputed that employees who feel that they have been discriminated against or sexually harassed have not properly reported the situation to Aaron's unless they have called the toll-free Employee Relations hotline." (Doc. 34 at 2). This does not constitute a denial that the policy form contained this language nor the fact that Moat signed it. Therefore, the facts as set out in this paragraph are deemed admitted.

During her employment, Moat failed several "Phone Shops," which are unannounced test phone calls from an Aaron's corporate employee intended to test how well employees sell merchandise over the phones. In her six-month performance review, issued on or around March 24, 2012, Moat received an overall score of 2.28 out of 5, which the parties acknowledge is considered "Below Expectations." Over the course of her first seven months, she also received written counseling for failing to complete tasks assigned to her and for failing to meet sales goals.[2]

At Aaron's, Moat had a 19 or 20-year-old co-worker named Cody Myers ("Myers"). Moat joked with him, referred to him as "Little Cody" (while he called her "Granny Janie"), and at one point hugged him. However, during Moat's employment, Myers made frequent sexual propositions and sexually-oriented remarks to her, such as saying that her husband could not be "good in bed" because of his "kidney-failing soggy dick," that he had a low sperm count, and that his girlfriend's vagina "smelled like dead butterflies."[3] He also asked her questions about what she and her husband do during sex and about "booty sex." Myers was known to similarly ask male

---

[2] Moat contends that her "lesser sale figures after [she] and her husband complained to Keeling about the sexual harassment by Myers were the result of her being given excessive and unusual work duties which kept her away from the sales floor so she could not approach customers and make as many sales." (Doc. 34 at 6).

[3] In its Reply to Moat's Response, Aaron's objects to all of the factual contentions in Moat's "Additional Undisputed Facts" on the grounds that they are immaterial. (Doc. 38). Whether a statement is material is determined by the court, so an objection on the basis of immateriality does not make a fact disputed.

8

employees questions about whether they had or were going to have sex. Myers also would "hump the air" (to simulate having sex) behind Moat and behind other male employees in front of her, and would also stick out his tongue at her and male employees in front of her. At one time, Myers also touched Moat's ear[4] and asked her, "Do you shave?"

On or about April 1, 2012, Moat's husband, Stephen Moat ("Mr. Moat") came into the Gadsden store and asked to speak with the store's general manager, Bobby Keeling ("Keeling") about Myers. Mr. Moat reported to Keeling that Myers had been asking Moat about their sex life and requested that Keeling put a stop to the comments. Keeling had never witnessed any misconduct by Myers and was unaware until then of the alleged inappropriate comments. This was the first time Keeling had been informed of anything potentially inappropriate between Moat and Myers. Keeling took Mr. Moat's complaint "very seriously" and told Mr. Moat that if there was anything like that going on, it would stop immediately. Per company policy, Keeling reported Moat's complaint to senior regional manager Roger Estep. (Doc. 31-6). He told Estep that Mr. Moat had accused Myers of talking to his wife about something of a sexual nature and that Mr. Moat was offended by it.

Keeling then counseled Moat and Myers that, if any inappropriate conversation

---

[4] This is the only allegation that Moat has made of inappropriate <u>touching</u> by Myers.

was going on, it needed to stop immediately. After this counseling, Myers's behavior improved for a while. Mr. Moat later called Keeling and thanked him for his professional handling of the situation. Keeling believed that the matter had been resolved.[5] At no time did he report these allegations to Jill Reinert, the Associate Resources Representative at Aaron's corporate headquarters. Reinert has testified that Keeling should have notified her, and that she would have begun her investigation at that point.

On July 2, 2012, Mr. Moat came into the Gadsden location of Aaron's and told Myers, "If you steal another sale from my wife, we're going to have problems," as well as telling him to stop sexually harassing Moat. (Doc. 31-3 at 7). Myers then summoned Keeling, who met with Mr. Moat and asked him whether he was threatening Myers, to which Mr. Moat responded "It's not a threat; it's a promise." Mr. Moat also informed Keeling that he and Moat had retained an attorney. Keeling then told Mr. Moat that he could not speak further about the matter if an attorney had

---

[5] In her Response, Moat responds to this statement of fact by saying "While Keeling may have believed . . . that the alleged sexual harassment had been resolved, Plaintiff disputes that Keeling and/or Estep did all that they were required to do to investigate and discipline Myers under the Aaron's Non-Discrimination and Sexual Harassment Policy." (Doc. 34 at 6). The court's Uniform Initial Order states that facts "will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 2 at 17). Here, and at many other points in her Response, Moat's response to Aaron's statements of fact does not controvert the fact so much as attempt to head off a possible inference from that fact that would be unfavorable to her. Therefore, the court deems this fact to be undisputed and admitted.

been retained.[6]

### 3.    Aaron's Investigation of Moat's EEOC Charge

On or around June 25, 2012, Moat filed her first charge against Aaron's with the EEOC, alleging sexual discrimination and harassment. On July 2, 2012, Aaron's corporate headquarter in Atlanta received a copy of that charge. Moat did not utilize Aaron's corporate HR hotline to report harassment either before or after filing her EEOC charge.[7] Reinert was assigned to investigate the matter. This was the first time she had heard of the matter. She contacted Estep, the senior regional manager over the Gadsden store, to see if he had any knowledge of the matter, but Estep said that he did not. On July 9, 2012, in accordance with Aaron's investigative guidelines, Reinert traveled to the Gadsden store and interviewed Moat and all other employees at that location. (Doc. 31-11 at 2, 5).

During the interview with Reinert, Moat alleged that Myers made a number of boorish comments and gestures, including asking her on unspecified occasions "Did you smash last night?" or if she and her husband were "gonna have sex tonight,"

---

[6] Moat's Response "dispute[s] that Plaintiff's getting an attorney justified Keeling" declining to speak further. As explained in fn. 4, *supra*, this response does not dispute the actual fact asserted by Aaron's; rather, it makes a separate assertion and so the fact is deemed undisputed and admitted.

[7] Moat responds to this statement by "disput[ing] that Plaintiff was still required to use the hotline to report sexual Harassment after Keeling made his report to Mr. Estep." (Doc. 34 at 7). As explained in fn. 4, *supra*, this response does not dispute the actual fact asserted by Aaron's; rather, it makes a separate assertion and so the fact is deemed undisputed and admitted.

commenting on a single occasion that her husband (who suffers from kidney failure) could not "be good in bed" because of his "kidney-failing soggy dick," asking on single occasions, "Do you shave?" and "Have you ever had bootie sex?," commenting on single occasions that he had "low sperm count" and that his girlfriend's vagina "smelled like dead butterflies," and on unspecified occasions making supposedly sexual gestures (which Moat characterized as "humping the air"), sticking his tongue out, and standing too close while talking to her. Moat also alleged that Myers engaged in some of the same behavior toward both male and female employees in the store, including asking male employees if they "smashed" or were going to have sex, making the same supposedly sexual gesture (i.e., "humping the air") behind the backs of male employees, and sticking his tongue out at male employees.[8]

Reinert's investigation came to the following conclusions:

- Myers touched Moat inappropriately on the one occasion when he allegedly touched her ear.

- Moat's allegations of sexual harassment by Myers were not able to be corroborated by reviewing the store's video recordings because the alleged incidents had taken place several months before Reinert's

---

[8] Moat's Response disputes "that Myers was simply an 'equal opportunity harasser' of men and women at the store." (Doc. 34 at 8). Moat contends,"When Myers would make his "supposedly" sexual gestures ("hump the air") behind other employees, or stick his tongue out at male employees too, Plaintiff was always the only woman around, and he was doing it just to provoke a response from her." (*Id.*). Again, this does not controvert the facts alleged, and so the facts are admitted. See fn. 4, *supra*.

investigation. (Doc. 31-11 at 5).[9]

• Myers denied making any of the alleged sexual comments or gestures but admitted to engaging in inappropriate horseplay in the workplace with other employees, such as engaging in a choke hold with another associate, sarcastically saying "I love you" and "Aren't you adorable" to male associates, and throwing a kissing in the air to a male associate.

• Based on the horseplay Myers admitted to engaging in, Myers had violated the company's workplace policies
.
• However, none of the Aaron's employees, including Myers, were found to have violated the company's sexual harassment policies.

Reinert issued Myers a final written warning instructing him that any further violation of Aaron's policies would result in termination.

In addition, Aaron's transferred Myers to a different store on July 26, 2012. Moat alleges that, a few days before the transfer, Myers stuck his tongue out at men in the store, "acting like he wanted to kiss them, and then looked at [Myers] to see how she reacted." (Doc. 34 at 9). She also alleges that Myers twice returned to the Gadsden store and "st[ood] around staring at [her] while [she] was doing [her] job - - with a smug grin" for about half an hour. *Id.*

### 4. The EEOC's Investigation of Moat's Charge[10, 11]

---

[9] Moat contends that the "sexual harassment of the Plaintiff by Myers could have been viewed by Reinert on video" had the investigation been started when Moat and Mr. Moat first complained to Keeling, who reported it to his supervisor Estep. (Doc. 34 at 8).

[10] In her Response, Moat "disputed that the EEOC's findings [as well as "the EEOC investigator's opinions or conclusions"] are relevant or admissible to prove that Defendant did

On October 31, 2012, the EEOC completed its investigation of Plaintiff's charge, finding that it was unable to conclude that the information provided by Plaintiff established a violation of Title VII. In a Pre-Determination Summary Sheet issued by the EEOC, the investigator assigned to Plaintiff's charge concluded as follows:

> During the analysis of the documents, they have yielded no evidence to remotely demonstrate that [Moat] was subjected to any bias [or] discriminatory action. Rather, the evidence shows that during the relevant time period, [Moat] received an overall average between "Below Expectation" and "Meets Expectation". In addition, the evidence shows that [Moat] received numerous counseling sessions concerning her poor performance. The evidence has shown that [Moat] did not use [Aaron's] hotline with regard to allegedly being subjected to a sexual hostile environment. [Aaron's] has a clear and comprehensive sexual harassment policy that [Moat] was privy to at the time she was employed. Moreover, once [Moat] made known to management that alleged sexual harassment had occurred in the work place, [Aaron's] promptly investigated the claim. Although the outcome of the investigation yielded no evidence to corroborate that sexual harassment occurred, [Aaron's] took immediate and appropriate action by transferring the alleged male harasser to another store and issued him a stern disciplinary final written warning. . . .

---

not violate Title VII." (Doc. 34 at 8, ¶¶46, 47, 47). This objection is underdeveloped. Insofar as it questions the admissibility of the EEOC's decision, it is without merit. The EEOC's final decision regarding a claim of discrimination is admissible under FED. R. EVID. 803(8)(c), providing for admissibility of public records and reports setting forth factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness. *Chandler v. Roudebush*, 425 U.S. 840, n.39 (1976). Insofar as Moat questions the relevancy of the EEOC's findings, her conclusory assertion fails to provide any reason to controvert the general assumption in this circuit that "EEOC reports and findings . . . [are] highly probative." *Barfield v. Orange Cnty.*, 911 F.2d 644, 649 (11th Cir. 1990).

[11] The court, however, relied exclusively on its review of the evidence and arguments presented at summary judgment and gave no weight to the EEOC's findings.

In summary, there is no evidence to demonstrate that [Moat's] civil rights have been violated under any statute enforced by the EEOC.

Unsatisfied with the EEOC's conclusion, Plaintiff wrote to the EEOC. In response, the EEOC reaffirmed its original findings, concluding:

There were no indications that further investigation would disclose a violation of the statute enforced by the EEOC. The evidence of record also did not indicate that you were discriminated against because of your sex. There was no evidence that you suffered an adverse employment action as a result of you filing your charge with the EEOC. You have provided no other evidence that would warrant a difference [sic] determination. Accordingly, your request for reconsideration is denied.

### 5.    Moat's Charge of Retaliation and Resignation from Aaron's

Plaintiff spoke to Reinert two or three times after her investigation of the first charge and told her that Morgan, the sales manager, was giving her more work to do, giving her unfavorable duties, and being hostile to her. Morgan admits that she asked Moat to mop the floors and clean the toilets during regular business hours. All Aaron's associates are expected to clean toilets and mop floors when necessary, and Myers and Morgan did so as well at times. (Doc. 31-4 at 27-28; Doc. 31-7 at 21). Keeling has testified that he "wouldn't suggest anyone cleaning toilets during business hours" because that could be done before the store opens or after it closes. (Doc. 31-6 at 22). During the month of June, 2012, sales manager Morgan had 49 sales, Myers, the other customer sales representative, had 53 sales, and Moat had only 15 sales.

On December 3, 2012, Moat filed another EEOC charge, alleging that Sales

Manager Linda Morgan ("Morgan") retaliated against her for her first charge by "not communicating" with her, "not informing [her] about sales or promotional opportunities in the store," and giving her "the most undesirable jobs, such as cleaning the bathroom." Reinert requested that Plaintiff meet with her to discuss the allegations in her new charge, but Moat refused to do so.[12] While this second EEOC charge was pending, Moat obtained an offer of employment from another company at a higher salary than what she earned at Aaron's. Moat then resigned her employment with Aaron's effective January 5, 2013, with three weeks' advance notice. She worked through the entirety of her notice period and then began at her new job with no gap in employment.

Moat initiated this action on January 25, 2013. At her request, the EEOC issued her a notice of right to sue on her second charge without a finding. She then amended her complaint in this action to incorporate the claims asserted in her second EEOC charge.

### B.    Material Facts in Dispute

Moat contends that her lesser sales figures after she and her husband complained to Keeling about the sexual harassment by Myers were the result of her

---

[12]Moat's Response says that she refused to speak to Reinert because Morgan had been hostile to her after each prior time that she spoke with Reinert. (Doc. 34 at 10). This is consistent with Moat's deposition, where she testified that every time she spoke to Reinert, Morgan "would just totally change and start treating [her] worse." (Doc. 31-1 at 48).

being given excessive and unusual work duties which kept her away from the sales floor so she could not approach customers and make as many sales. (Doc. 34 at 21-22). According to Moat, in retaliation for her EEOC complaints, Morgan would tell her "more than anyone else to clean the bathroom, vacuum, and take out the trash, and had her and only her to mop the floor, so she could not sell and make money." (*Id.* at 23). She also alleges that when she was with a customer, Morgan would interrupt her and say that only she [Morgan] could mark the merchandise down so the customer should come to her. (*Id.*). Additionally, she claims that Morgan would type up lease agreements in her own name when Moat had made the sale, and that the managers at the Gadsden store stopped or delayed helping her close paperwork after she complained. (*Id.*).

Moat says that the retaliation by Morgan had begun in April after Plaintiff had complained to Keeling but before the first EEOC charge was filed in June. (*Id.* at 22). She also argues that Reinert did not construe anything in Plaintiff's first EEOC charge to allege any type of a retaliation claim and so did not investigate any issues of retaliation. (*Id.*).

## IV.   <u>ANALYSIS</u>

### A.   **Hostile Work Environment**

Aaron's does not dispute that Moat belongs to a protected group (women) or that she was subject to unwelcome words and conduct from Myers. Aaron's Motion argues that, as a matter of law, Moat cannot prove the remaining three required elements of a hostile work environment claim. (Doc. 32 at 24). These three challenged elements are: (1) that the harassment was based on a protected characteristic, (2) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (3) that the employer is responsible for such environment under a theory of vicarious or of direct liability. *Miller*, 277 F.3d at 1275. For the reasons explained below, Aaron's motion on this claim is due to be **GRANTED**.

### 1.   Moat Cannot Show That The Allegedly Discriminatory Conduct Was Based On Her Gender

Aaron's argues that Moat's hostile work environment claim fails because Myers's conduct "was directed equally at both male and female employees and, therefore, was not *because* of [Moat's] sex." (Doc. 32 at 27) (emphasis in original). Aaron's points to Moat's own testimony that Myers engaged in the same sorts of boorish behavior ("humping the air" behind and sticking out his tongue at) towards male employees as towards her, and asked those male employees some similar questions about their sexual habits.

Title VII prohibits discrimination, including harassment that discriminates

18

based on a protected category such as sex. Because a claim of sexual harassment under Title VII is a claim of disparate treatment, in order to prevail a <u>plaintiff must show that similarly situated persons not of [her] sex were treated differently</u> and better.

*Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301-02 (11th Cir. 2007) (internal quotation marks, brackets, and citations omitted) (emphasis added).

Moat acknowledges that Myer engaged in such behavior around male co-workers, but argues that, "When Myers would make his sexual gestures [sticking out his tongue at and "humping the air" behind male employees] [Moat] was always the only woman around and he was doing it just to provoke a response from her." (Doc. 34 at 28). This argument asks the court to speculate that the conduct was solely intended to harass Moat, rather than the male employee who was the apparent recipient of his gesture. As the nonmoving party, the court will make every <u>reasonable</u> inference in Moat's favor, but she is still required to "designate <u>specific facts</u> showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted) (emphasis added).

The fact that Moat was the only woman around Myers when he behaved this way does not prove that his actions in her presence were directed at her. Attributing that particular intent to Myers would require, at the very least, evidence that he only used such words and conduct when she was present, but Moat has not given any evidence of this. Moat does cite to several portions of her own deposition, but none

of this testimony alleges any specific facts supporting the conclusion that Myers was intending to provoke Moat when he did this. (Doc. 31-1 at 27-28). Her testimony merely asserts this intent in a conclusory fashion, e.g., "I was the only woman around and it was to see how I reacted," and "Because I was around and then he would see how I'm going to react to it." (*Id*. at 27).

Myers was disciplined by Aaron's through a written warning and reassignment after Reinert's investigation confirmed horseplay, touching other male employees, and making inappropriate comments to other male associates. (Doc. 31-11 at 5-7). The evidence on record leads inescapably to the conclusion that Myers's crude remarks and raunchy gestures were directed towards both men and women. Because of that fact, any harassment of Moat by Myers, as a matter of law, could not be characterized as discrimination on the basis of her Title VII-protected class, her gender.[13]

### 2.     The Issues Of Employer Liability And Severity Or Pervasiveness Of Conduct Are Not Reached

Aaron's also argues that summary judgment is due to be granted on Moat's

---

[13] Moat also suggests she is raising an alternative argument that this element was satisfied, citing authority for the proposition, "words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff." (Doc. 34 at 28). She does not explain how the facts of this case fit into that rule, and the court does not see how any of Myers's words and conduct toward the other men can be construed as female-specific; his "humping the air" behind a male employee and asking other men if they had "smashed" or were planning to have sex did not have any derogatory connotations against women and not men. Therefore, this alternative argument has no applicability to the case at hand.

hostile environment claim on the other two challenged elements: that there is no basis for its liability for any harassment that may have occurred, and that the alleged harassment was not sufficiently severe or pervasive. (Doc. 32 at 17). Because summary judgment is due on the basis of Moat's failure to present evidence sufficient to show that Myers's conduct was based on her gender, the court need not and does not reach these issues.

### B.    Retaliation

Aaron's also has moved for summary judgment on Moat's retaliation claim. It argues that Moat cannot meet the second and third requirements under *Burlington N.*, 548 U.S. at 68-69, for a *prima facie* case of retaliation: that the employer subjected the plaintiff to some action that would be materially adverse to a reasonable employee, and that there was a causal connection between the adverse action and the protected activity. (Doc. 32 at 32). Aaron's also contends that, even if Moat could make a *prima facie* case for retaliation, she has not given any proof that Aaron's stated reasons for the challenged actions were pretextual. (Doc. 32 at 36). For the reasons explained below, Aaron's motion is due to be **GRANTED** on this claim.

### 1.    Moat Has Not Given Evidence To Show That Any Action Could Qualify As Materially Adverse

According to the Supreme Court, in order to support a claim of retaliation, an action must have been "materially adverse," which is defined as an action that "might

have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. Aaron's argues that, as a matter of law, none of the actions alleged by Moat would be materially adverse. Viewed in the light most favorable to the plaintiff, the following actions took place after Moat filed her EEOC suit:

(1) For some time, sales manager Linda Morgan was hostile toward Moat and avoided communicating with her except by giving to-do lists.

(2) Moat was told by Morgan to do a disproportionate amount of the cleaning tasks (compared to other employees) for the store. She was often asked to clean the women's bathroom and mop the floors during regular business hours. Moat also was ordered to help carry heavy furniture out of the warehouse into the store. All of these tasks were included in her job description, but she was asked to do them more often than other employees.

(3) On two or three occasions, Morgan credited a sale to herself when Moat had actually deserved the credit. At other times, she attempted to "steal customers" by promising discounts to customers whom Moat was already attending.

(4) On an unspecified number of occasions, the store managers (the only employees who could fill out the paperwork to close a sale) would delay assisting her in finishing her sales.

The first category of allegedly adverse action — Morgan's hostility and avoidance of communication — has consistently been held not to qualify as materially adverse pursuant to the Supreme Court's statement in *Burlington N.*, 548 U.S. at 68, that the "decision to report discriminatory behavior cannot immunize that employee

22

from those petty slights or minor annoyances that often take place at work." *See, e.g.,*

*Johnson v. Weld Cnty.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (holding that giving the

"cold shoulder" and avoiding the plaintiff are not sufficient to support retaliation

claim); *Recio v. Creighton Univ.*, 521 F.3d 934, 940–41 (8th Cir. 2008) (holding

"silent treatment" was nonactionable "petty slight" and not materially adverse for

retaliation claim); *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (holding

that allegations of rudeness and unfriendliness by supervisor and co-worker,

"unpleasant work meetings, verbal reprimands, improper work requests and unfair

treatment do not constitute adverse employment actions as . . . retaliation").

As to the second category — Morgan assigning Moat a disproportionate share

of cleaning duties and inventory transportation — it is significant that those tasks were

part of her job description. Aaron's accurately summarizes the law in its Motion:

"being asked to perform 'undesirable' or 'unnecessary' work is not a materially

adverse action, particularly where, as here, the 'undesirable' or 'unnecessary' tasks

assigned are part of the employee's job duties." (Doc. 32 at 33). The Eleventh Circuit

has stated that "Title VII is not designed to make federal courts sit as a

super-personnel department that reexamines an entity's business decisions." *Davis v.

Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001). Therefore, courts are

reluctant "to hold that changes in job duties amount to adverse employment action

when unaccompanied by any tangible harm." *Id.* "A change in work assignments" will only be actionable "in unusual instances" where it is "so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." *Id.* at 1245. This is not one of those "unusual instances." No reasonable jury could conclude that Moat's being assigned more cleaning and inventory movement than other employees would dissuade a reasonable employee from maintaining a charge of discrimination.

The third category of alleged adverse actions is sales that should have gone to Moat, but were improperly credited to Morgan. At one point in her deposition, she alleged that three sales were stolen (doc. 31-1 at 50), but she could only describe two sales. The first, to Edward Hussey, took place in March or April of 2012. (Doc. 31-1 at 69). Since Moat did not file her first EEOC charge until a few months later, in June, this incident cannot have been retaliation for that charge. The other sale, to Joan Hamilton, occurred on July 6, 2012. Aaron's has claimed "it is undisputed that [Moat] subsequently received credit for the July sale after Morgan realized that she had inadvertently credited herself with the sale." (Doc. 38 at 11). In the portion of Morgan's deposition that Aaron's cites, Morgan does say that she credited herself accidentally, but she also says that she did not remember if this mistake was ever corrected and if Moat received the commission for that sale. (Doc. 31-7 at 22). This is the only evidence cited by Aaron's, and the court has not been able to find any other

evidence as to whether Moat ever received payment for the sale to Hamilton. Wrongful withholding of a sales commission has a financial impact on an employee, and it is well-settled that a decision with a <u>significant</u> financial impact can be an adverse employment action. *See Davis*, 245 F.3d at 1238; *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014). However, Moat has presented no evidence of what commission or other benefit she would have received had the sale been credited to her. It is the plaintiff's burden to prove all elements of her claim, and, based upon the lack of evidence presented, no reasonable factfinder could conclude that Moat suffered a <u>significant</u> financial detriment.

Neither does any material question of fact remain as to the fourth alleged category of adverse action, that managers at Aaron's would delay helping Moat close a sale. Moat said, "I can't think of any [sales] that I was unable to close. Eventually – after them making me wait a long time, they would eventually do it after making me and the customer wait, and customer would get angry sometimes." (Doc. 31-1 at 63). Without any lost sale or damage to her job, a manager's delay in giving help, even though intentional and spiteful, is only one of the "petty slights" that the Supreme Court has said fall short of being "materially adverse." *Burlington N.*, 548 U.S. at 68.

### 2. The Court Does Not Reach The Issues Of Causation And Pretext

Aaron's also asserts that summary judgment is due on Moat's retaliation claim

on the grounds of Moat's failure to carry her burden of proof as to the two other challenged elements: causation and pretext. Because summary judgment is due on the basis of Moat's failure to present evidence sufficient to show any materially adverse actions against her, the court need not and does not reach these issues.

## V.   CONCLUSION

Aaron's motion for summary judgment is due to be **GRANTED** as to Moat's hostile work environment claim. It is also due to be **GRANTED** on Moat's retaliation claim. The court will enter a separate final judgment order consistent with this memorandum opinion.

Additionally, Aaron's motion to strike plaintiff's deposition errata sheet (doc. 39) is **GRANTED**.[14]

---

[14] FED. R. CIV. P. 30 governs errata sheets, and states,

(1) **Review; Statement of Changes**. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
    (A) to review the transcript or recording; and
    (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.
(2) **Changes Indicated in the Officer's Certificate**. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

According to the rule, Moat was required to submit her deposition errata sheet to the officer in charge of the deposition (in this case, Cindy C. Jenkins, ACCR #470) within 30 days of being notified of the transcript's availability. Jenkins would then have been required to attach

**DONE** and **ORDERED** this 12th day of November, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

_____

the changes to the transcript. However, it does not appear that Moat followed the required procedure. The errata sheet was purportedly signed by the plaintiff on April 14, 2014. (Doc. 35 at 3). This was the same day that Aaron's filed its motion for summary judgment, and submitted Moat's deposition as evidence. (Doc. 31-1). The errata sheet was then filed with the court over a month later, on May 15, 2014. There is no indication that it was ever presented to Jenkins, the proper recipient of it. The party submitting the errata sheet (Moat) bears the burden of showing that she complied with the Federal Rules of Evidence, and she has failed to do so. Therefore, Aaron's motion to strike is due to be **GRANTED**.